David L. Scher, Esq.
dscher@employmentlawgroup.com
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
soswald@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)

Mark Kleiman, Esq.
Law Office of Mark Allen Kleiman
mkleiman@quitam.org
2907 Stanford Avenue
Venice, California 90292
310-306-8094

FILED
CLERK, U.S. DISTRICT COURT
AUG 12 2013
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

CV13- 5861 (AJWx)

[UNDER SEAL],

Plaintiff,

v.

[UNDER SEAL],

Defendant.

CASE NO.:

**COMPLAINT FOR VIOLATOINS OF THE FEDERAL FALSE CLAIMS ACT**

**FILED UNDER SEAL**
(Pursuant to 31 U.S.C. § 3729 False Claims Act)

**JURY TRIAL DEMANDED**

David L. Scher, Esq.
dscher@employmentlawgroup.com
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
soswald@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)

Mark Kleiman, Esq.
Law Office of Mark Allen Kleiman
mkleiman@quitam.org
2907 Stanford Avenue
Venice, California 90292
310-306-8094

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* MARIA GUZMAN | CASE NO.: ________________ |
| Plaintiff, | **COMPLAINT FOR VIOLATOINS OF THE FEDERAL FALSE CLAIMS ACT** |
| v. | |
| INSYS THERAPEUTIC, INC., | **FILED UNDER SEAL** (Pursuant to 31 U.S.C. § 3729 False Claims Act) |
| Defendant. | **JURY TRIAL DEMANDED** |

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## Introduction

1. Qui tam relator Maria Guzman ("Guzman"), by her attorneys, individually and on behalf of the United States of America, files this complaint against INSYS Therapeutics, Inc. ("INSYS") to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., ("FCA" or "False Claims Act").

2. INSYS instituted a kickback-fueled off-label marketing campaign to induce doctors to prescribe INSYS's drug SUBSYS, a powerful opioid agonist drug that stimulates activity at opioid receptors in the central nervous system normally stimulated by naturally occurring opioids. SUBSYS is a fentanyl product, in the opioid agonist family with such other drugs as morphine, oxycodone, and heroin. As a result of the off-label campaign and egregious financial kickbacks, SUBSYS is being marketed and prescribed far beyond its stated indication, which is limited to breakthrough cancer pain only, at a beginning dosage of 100 micrograms.

3. The FDA has contraindicated SUBSYS for several uses due to the risk of overdose and requires enrollment in a special program in order to prescribe this potent and addictive drug. INSYS's off-label campaign, which includes the kiss of death message, which encourages doctors to quickly titrate patients, has resulted in at least one pharmacist contacting the relator to ask her to return a patient to a lower, safer dosage. INSYS off-label marketing and financial inducements have been

successful as many doctors write SUBSYS for contraindicated and off-label uses in Medicare and Medicaid patients, including for postoperative pain and back pain, which is counter to FDA warnings of respiratory failure and death. INSYS also utilizes a mail order pharmacy that sends SUBSYS to patients who had not requested the drug and that does not properly instruct patients on the storage of SUBSYS, which can lead to children fatally ingesting the drug.

4. INSYS instituted programs throughout the country to induce doctors to prescribe SUBYS over those of competitors by means of monetary payments, trips to strip clubs and shooting ranges, stock options, hiring physician's significant others, and expensive meals in violation of federal anti-kickback laws. One physician, Dr. Stuart Krost, was promised a $100,000 payment for this "support with SUBSYS" and INSYS spent $58,000 on meal expenses for doctors in just one month. INSYS, focusing on increasing its market share and generating high revenues, disregarded patient well-being, such as sending congratulatory emails to sales representatives that state, "Cha Ching again!" when a patient is prescribed SUBSYS for $40,000. INSYS has increased profits enough to publicly trade SUBSYS, earning $36 million in gross proceeds from the sale of 4.6 million shares in May 2013. Many of the INSYS executives have stock options for hundreds of thousands of dollars.

5. INSYS also maintains a work environment in which the male-dominated executive and management team frequently sexually treat female doctors who fail to

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

prescribe "enough" SUBSYS in exchange for their kickbacks from INSYS with blatant disrespect, best summarized in a text message from INSYS Vice President of Sales Alec Burlakoff, in a text message to the Relator regarding a female doctor in her territory: "She fuckn sucks kock mia! What else can I say! XOXOXO…I hate that stupid bitch – dr banchik!!!!!!!! I want to jerk off in her fuckn face! Joe would jerk off in her face, but his dick is too tiny for him to grab." The same attitudes and behavior were used harass female sales representatives.

6. In connection with the filing of this original Complaint, Relator has furnished the United States with substantially all material evidence and information in Relator's possession.

**Jurisdiction and Venue**

7. This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

8. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732 (a) because the Defendant transacts business in this judicial district.

9. Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) and under 28 U.S.C. § 1391(c) because the Defendant transacts business in this judicial district.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## Parties

10. Relator Maria Guzman is a citizen of the United States and a resident of Alexandria, Virginia.

11. Relator resided in Florida until June 2013.

12. Guzman began working for INSYS in January 2012 as a Specialty Sales Professional.

13. Guzman is still employed with INSYS and is on the South East Region sales team, with her territory in the West Palm Beach area of Florida.

14. Defendant INSYS Therapeutics, Inc. is a specialty pharmaceutical company headquartered at 444 South Ellis Street, Chandler, Arizona, 85224.

15. INSYS is incorporated in Delaware at 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

16. INSYS has two marketed products: SUBSYS and Dronabinol SG Capsule, and is awaiting approval for Dronabinol Oral Solution.

17. SUBSYS is a fentanyl sublingual spray: a proprietary, single-use product that delivers fentanyl, and opioid analgesic, in seconds for transmucosal absorption under the tongue.

18. Transmucosal immediate-release fentanyl ("TIRF") products generated $440 million in U.S. sales in 2010 and INSYS believes this market has the potential to expand with its faster-acting fentanyl product, SUBSYS.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

19. In March 2011, INSYS submitted a New Drug Application to the Food and Drug Administration ("FDA") for Fentanyl SL Spray for the treatment of breakthrough cancer pain in opioid-tolerant patients.

20. The FDA approved SUBSYS for the limited use of relieving breakthrough cancer pain, which is characterized by sudden, often unpredictable, episodes of intense pain that can peak in severity despite pain medication.

21. SUBSYS was approved for sale on January 5, 2012 and was made publicly available on March 26, 2012.

22. On May 7, 2013, 5 days after its initial public offering of common stock, INSYS closed the offering as all 4,600,000 shares had been sold, with aggregate gross proceeds of $36.8 million.

23. Michael Babich has served as President since November 2010 and was appointed Chief Executive Officer in March 2011.

24. INSYS's Executive Team is comprised of three men and the INSYS Board of Directors has seven male members; there are no females on the Executive Team or the Board and very few female managers.

25. The absence of women in leadership roles at INSYS contributes to the rampant sexual harassment and the hostile work environment for its female employees, including sales representatives experiencing unwanted flirtatious

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

comments from executives and management sending sexually explicit text messages to female members of their sales team.

26. The INSYS Code Conduct states that, "INSYS values a work environment that is free of any form of harassment…[which] can included unwelcomed sexual conduct, threats or offensive comments."

## FACTUAL ALLEGATIONS

### Work History and INSYS's Hiring Strategies.

27. In January 2012, Guzman began working for INSYS as a Specialty Sales Professional.

28. Guzman remains on the INSYS South East Region sales team, with her territory in the West Palm Beach area of Florida.

29. Before serving as a sales representative for SUBSYS, Guzman did not possess any pharmaceutical sales experience: Guzman earned her Bachelor's degree in Education and Dance, worked for G&K Services (a company that provides work uniforms), and was a Marketing Associate for Corporate Counseling Associates.

30. INSYS hiring individuals without pharmaceutical experience as sales representatives serves as a standard practice for the company.

31. INSYS Specialty Sales Professionals who lack previous pharmaceutical experience are unfamiliar with compliant marketing standards.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

32. In or around late 2012, INSYS hired Lillian Logatti, a dental hygienist who lacked pharmaceutical sales experience, as a South East Region sales representative.

33. INSYS apparently hired Logatti to have sexual relations with doctors in exchange for SUBSYS prescriptions, which has been implied by INSYS management and employees, through statements such as one in which Joe Rowan, the Southeast Regional Sales Manager told Dr. Bart Gatz that she (Logatti) was as dumb as rocks, but that she was sleeping with another doctor and getting a lot of prescriptions out of him." During the April 2013 National Sales Conference Rowan publicly stated that Logatti had been "out there working it" in regards to forming relationships with her doctors.

34. Aside from recruiting individuals who lack pharmaceutical sales experience, INSYS has also hired many former Cephalon, Inc. employees.

35. On or around September 29, 2008, the Department of Justice ("DOJ") announced a $435 million settlement to resolve off-label marketing claims relating to Actiq, a TIRF product, and two other drugs.

36. On or around September 29, 2008, the DOJ stated that $375 million of the plea agreement was to resolve False Claims Act allegations arising from claims to Medicaid, Medicare, and other federal programs.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

37. Like the SUBSYS label, the Actiq label stated that the drug was for opioid tolerant cancer patients with breakthrough cancer pain, to be prescribed by oncologists or pain specialists familiar with opioids.

38. Cephalon utilized the mantra "pain is pain," and instructed Actiq sales representatives to focus on physicians other than oncologists and to promote Actiq for uses other than breakthrough cancer pain.

39. INSYS employees also promote this motto and target doctors other than oncologists.

40. In December 2011, INSYS hired Matt Napoletano ("Napoletano"), a former Cephalon executive who led the launch for several of its pain products, as its Vice President of Marketing.

41. In or around November or December 2012, INSYS hired former Cephalon employee Dan Tondre ("Tondre") as a Specialty Sales Professional.

42. During a conference call in late 2012 or early 2013 with other Special Sales Professionals and managers, Tondre described how he sold INSYS drugs to doctors, stating that, "Pain is pain. It does not matter whether it is back pain or a migraine. Pain is pain and SUBSYS treats pain."

43. INSYS management frequently has praised Tondre for his success at Cephalon and has instructed other sales representatives to follow his lead in the marketing of SUBSYS.

44. In December 2012, Rowan sent a text message to the South East Region sales team congratulating Tondre for making a 1200 mcg SUBSYS sale and then stating that Tondre was "asking for the business wow…it works…let's get them Southeast."

45. INSYS has hired other former Cephalon employees, many of whom handled marketing for that company, including Vice President of Sales Alec Burlakoff, Specialty Sales Professional and National Trainer Karen Hill, Specialty Sales Professional and Regional Sales Manager for the South East Region Joseph Rowan, Specialty Sales Professional and Regional Trainer Nannette Alonzo, Specials Sales Professional Marcus Seiferith, and Medical Marketing Communications Senior Manager Desiree Hollandsworth.

46. INSYS has comprised a team of employees who have either been recruited from a pharmaceutical company that settled a multi-million dollar off-label marketing lawsuit or individuals without any pharmaceutical sales experience or familiarity with compliant marketing standards.

47. INSYS also established relationships with and speaker programs for former Cephalon prescribers, including Doctor Stuart Krost ("Dr. Krost"), Doctor Bart Gatz ("Dr. Gatz"), and Doctor Lisa Banchik ("Dr. Banchik").

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**The INSYS Business Model and Kickbacks to Doctors.**

48. The INSYS business model consists of providing doctors with substantial compensation – including, stock options, strip club trips, and hiring physicians' significant others – so that the doctor then returns the "favor" to the sales representative by prescribing SUBSYS. One physician was even offered $100,000 in payments.

49. In or around March 2013, National Trainer Karen Hill created a PowerPoint presentation ("2013 PowerPoint") for Specialty Sales Professionals which illustrates the centrality of payoffs, such as instructing representatives to target Drs. Lee and Arcila for more lucrative speaking opportunities and stating that Drs. Kornick, Kramarich, and Khanna will be paid through more preceptorships (which usually entail allowing a representative to shadow the doctor but which INSYS is using as another marketing tool).

50. The 2013 PowerPoint contains several pictures of doctors out drinking with INSYS staff.

51. The 2013 PowerPoint outlines what "hot buttons" representatives should utilize with doctors, such as "$" and "hanging out."

52. The 2013 PowerPoint provides "special notes" about the doctors and ways to increase sales with them such as "loves to party."

53. The 2013 PowerPoint highlights "challenges" that representatives will face with some of the doctors such as "very conservative and cautious…continue challenging her thinking" as well as "potential" with some physicians, such as "good with increasing strengths."

54. In July 2012, Vice President for Sales Alec Burlakoff sent a text message to Guzman stating, "I know pedro [Dr. Charles Huang's physician's assistant] very well also…He's the one who probably writes the most. Let's take pedro out for some fun! I bet you he would LOVE to smoke with us!"

55. INSYS's tactics have resulted in doctors recommending and writing SUBSYS prescriptions for their patients, including those on Medicare and Medicaid, in exchange for kickbacks, and often times switching patients from Actiq, SUBSYS's competitor.

**Kickbacks and Speaker Programs.**

56. One of the primary ways INSYS provides doctors with kickbacks for prescribing SUBSYS is through its speaker programs.

57. INSYS speaker programs consist of the doctors giving presentations to others regarding their experience with SUBSYS and in return they receive a speaker fee.

58. INSYS officially states that speaker programs are based on clinical experience, and not on the amount of SUBSYS the doctor prescribes.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

59. In July 2012, Burlakoff sent a text message to several sales representatives in which he stated "we have done all these programs and we are flat in sales…Are our speakers doing their part…We must hold our speakers accountable, programs are going to begin to get cancelled very quickly…Clearly, we have done a poor [job] setting proper expectations for our speaker."

60. In July 2012, Burlakoff sent Guzman a text message stating, "Don't worry about Dr Banchik or Dr Vendrys's speaking abilities. They do not need to be good speakers, they need to write a lot of Subsys."

61. In December 2012, Burlakoff sent the following text message: "Mia - just wanted to make sure you know that Dr Banchik is taking you for a ride. She doesn't produce shit for units or dollars. She needs to understand you can't keep giving her programs, when gatz has truly earned them! Show her the numbers!"

62. During the April 2013 conference, Rowan explained how he would like the speaker program ran, instructing representatives not to take doctors to Ruth's Chris Steakhouse or other expensive restaurants because he did not want a large amount of money spent on "dipshits that aren't going to write," but would rather keep that money in the budget to spend on other doctors for "better uses."

63. The INSYS Code of Conduct states that the company must "monitor all fees, payments, and compensation paid for advisory, consulting or other services to avoid even the appearance of inappropriate influence."

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

64. The INSYS Certificate of Compliance states, "INSYS has established an annual spending limit of $1,500 on meals and educational items which may be provided to a healthcare professional." Fees from services to such healthcare professionals are excluded from this amount but are always based on fair market value…items of nominal value (less than $10) or financial support for educational programs are also exempt from this amount."

65. In April 2013, Burlakoff sent Dr. Krost a text message in April 2013 which stated, "Dr. Krost…I know it[']s not a lot to you, but I can commit to 100K to you via speaker programs or meals toward your restaurant. We don't need the food, just charge our card and give [a]s an itemized receipt. Just need your support on subsys."

66. In October 2012, Burlakoff sent Guzman a text message and an email stating that Dr. Krost would earn $1,600 per program and that INSYS would hold all of Dr. Krost's programs in the restaurant he owns, to persuade him to switch his Aqtiq patients to SUBSYS.

67. In October 2012, Burlakoff indicated to Guzman in a text message that INSYS would pay Dr. Gatz $750 per hour for trainings conducted via telephone.

68. In December 2012, Burlakoff sent Guzman a text message stating that INSYS paid Dr. Gatz $36,000 in one quarter for speaker programs.

69. The doctors affiliated with INSYS participate in the speaker programs because of the substantial payments and kickbacks they receive, rather than their belief in the benefit of the drug for cancer patients.

70. In September 2012, Burlakoff sent Guzman a text message indicating that "I think dr krost would want to speak, he loves money."

71. On August 16, 2012, Dr. Banchik sent a text message to Guzman thanking her for a "fun night" and stating "I just wish I had more MD`S that can write it themselves but these people will refer to me to write it for them."

72. In 2012, Dr. Banchik received speaker fees and referrals from participating in the INSYS speaker programs, and because she then obtained more patients through these referrals, she was able to prescribe more SUBSYS and in return earn more speaker programs and fees from INSYS.

73. In September 2012, Dr. Banchik indicated how important these speaker fees to her when she sent a text message to Burlakoff asking why INSYS had failed to pay her for her program, stating, "I am not happy Alec."

74. In September 2012, Dr. Gatz sent Guzman an email inquiring about when he would be paid the $7,200 he was offered for three speaker programs in which he participated, as his honoraria check had been lost.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**Strip Clubs, Shooting Ranges, Meals, and Referrals.**

75. In addition to the program speaker fees that doctors receive for prescribing SUBSYS, INSYS also provides doctors with other kickbacks.

76. On or around Friday, January 18, 2013, Burlakoff and Rowan treated Dr. Gatz to a strip club visit, where they purchased him two $500 private champagne room sessions, to ensure he continued prescribing SUBSYS.

77. On or around January 19, 2013, Burlakoff sent Guzman a text message expressing that it "[w]ent fantastic last night. Bart and I got back around 4 am."

78. Shortly after January 18, 2013, Rowan sent Dr. Gatz a text message stating, "Dr. Gatz, we appreciate you more than you could believe....Leaving that meeting Alec and I felt very confident and what was going to happen....And you show loyalty to us like no other...You need anything at all, it is done."

79. Dr. Gatz responded to Rowan's text message in January 2013 with, "Thank you for the best weekend in years!!!"

80. The strip club visit resulted in an increase in prescription volume, as Guzman reported to Burlakoff and Rowan on Wednesday, January 23, 2013, just five days later, that Dr. Gatz had already written 17 SUBSYS prescriptions in three days.

81. Under the its Code of Conduct, the $1,000 INSYS spent for private champagne room sessions would not qualify as payment for an advisory services from Dr. Gatz nor would it qualify as gift of less than $100 designed for the patient or

for educational purposes; it would fall under the category of prohibited recreational activity.

82. INSYS has also provided Dr. Gatz with many expensive dinners, stock options, lunches for his office, and a trip to a shooting range, which serves as part of a company-wide scheme to both encourage doctors to, and reward them for, prescribing SUBSYS.

83. From on or about July 2 to July 10, 2012, Dr. Gatz prescribed 120 units of SUBSYS.

84. On July 18, 2012, Burlakoff instructed Guzman in a text message that she could take Dr. Gatz and "whoever out," and that he would supply his credit card number for the dinner.

85. From on or about July 23 to July 30, 2012, Dr. Gatz prescribed a total of 300 SUBSYS units.

86. On or about October 10, 2012, INSYS provided Dr. Gatz's office with lunch.

87. From on or about October 16 to October 30, Dr. Gatz wrote prescriptions for 720 units of SUBSYS.

88. In or around November 2012, Rowan suggested that INSYS send top prescribing doctors Thanksgiving dinners.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

89. During the April 2013 Arizona conference, Rowan and is South East Region sales team acknowledged how successful these meals were and, in particular, how Dr. Gatz's Office Manager ensured that prior authorizations were completed after the meals were delivered.

90. A January 2013 report sent to INSYS sales representatives indicates that the company spent over $58,000 on meal expenses for doctors, with Rowan and Burlakoff spending a total of approximately $15,000.

91. The INSYS Code of Conduct states that "[m]eals may occasionally be provided to HPCs [health care professionals] so long as they are modest and shared at a reasonable location that is conducive to discussing educational information."

92. The INSYS Certificate of Compliance specifies that "INSYS has established an annual spending limit of $1,500 on meals" per provider.

93. The Compliance Guidance for Pharmaceutical Manufacturers states that "entertainment, recreation, travel, meals and other benefits…potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business for the pharmaceutical company."

94. The INSYS Code of Conduct states that the company must "monitor all fees, payments, and compensation paid for advisory, consulting or other services to avoid even the appearance of inappropriate influence."

95. In the January 2013 email containing the expense report, Burlakoff stated that the representatives with the highest meal expenses should be ranked number one in their region and obtaining a "return on investment."

96. From on or about January 24 to February 5, 2013, Dr. Gatz prescribed a total of 670 SUBSYS units.

97. On or about February 5, 2013, Rowan sent text messages to Dr. Gatz and Guzman asking, "Would you like to get a bite to eat? Somewhere spectacular! Maybe shoot guns before?"

98. On or about February 19, 2013, Rowan took Dr. Gatz to the shooting range.

99. From on or about February 19 to March 7, 2013, Dr. Gatz prescribed a total of 1010 units of SUBSYS.

100. On or about March 11, 2013, Rowan sent Dr. Gatz a text message stating that he would take Dr. Gatz out to dinner anywhere he wanted, so that they could "eat and celebrate life."

101. INSYS also celebrated Dr. Gatz's loyalty in recommending SUBSYS by providing him with stock option.

102. In early 2013, Dr. Gatz had a conversation with Guzman regarding the stock options INSYS had offered her and she ascertained from his excited tone and knowledge of managing this particular stock that he was also receiving such options.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

103. On February 19, 2013, Guzman's belief that Dr. Gatz was receiving stock was confirmed by a conversation that she heard between Rowan and Dr. Gatz while the three were out at the shooting range and dinner, a conversation in which Rowan told Dr. Gatz that "INSYS takes care of its people" and that "I [Rowan] have stock options, [Guzman] has stock options, and you will have stock options."

104. During the conversation regarding the stock options, Dr. Gatz also indicated that he would like a position with INSYS and a home in Arizona, and Rowan reiterated that "INSYS takes care of its people."

**Hiring a Doctor's Significant Other or Family Member.**

105. In addition to the monetary and meal kickbacks, INSYS also encourages doctors to subscribe SUBSYS by hiring their significant others or family members.

106. On or around August 18, 2012 Burlakoff sent a text message to Dr. Charles Huang ("Dr. Huang") stating "I need to know if Paula [Dr. Huang's girlfriend] would take a full time job working for me? I also could use a few Subsys prescriptions. We have not seen anything, I want to have some fun!!! Can't do it w/o subsys scripts coming in at least once a day. Have Paula call me next week. Let's make it like the old days, turn the subsys switch on please Dr Huang!!...We mean what we say, just need you too (sic) get it going strong."

107. From on or about August 21, 2012 to August 22, 2012, Dr. Huang prescribed 60 units of SUBSYS.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

108. INSYS hired Dr. Huang's girlfriend, Paula, in or around fall 2012.

109. On or about March 28, 2013, Rowan asked Guzman if she could recommend any sales representatives for the Nashville, Tennessee region, and stated that the only qualification that INSYS required was that the individual was eighteen years old and that he did not care if the person did not possess a college degree.

110. During the conversation regarding a Nashville sales representative on or around March 28, 2013, Rowan told Guzman that the individual could be "anyone as long as it was a doctor's girlfriend, son or daughter," and further that if the individual were "banging a doctor, that would be perfect."

**Instructions for Avoiding Anti-Kickback Standards.**

111. Some INSYS managers and sales representatives were aware of the illegality of using kickback schemes to obtain SUBSYS sales, particularly the former Cephalon employees.

112. During the April 2013 INSYS conference in Arizona, management and specialty sales professionals shared methods with one another on how to avoid anti-kickback standards.

113. During the April 2013 conference, former Cephalon employee and INSYS National Trainer Hill stated that she would have a "legit [speaker] program" at an inexpensive restaurant where INSYS would provide her with $100 to spend per person, and she would use that budget to purchase wine and instruct the restaurant

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

staff to box the wine for the doctors to take home, remaining cautious as to how the doctors left with the wine.

114. During a meeting at the April 2013 Arizona conference, Former Cephalon employee and Manager Rowan stated that he is able to order beer, wine, cigars, and expensive meats through his friend who owns a delicatessen, and that him and another employee have been "doing this for years," which is one of the reasons he hired that employee.

115. After informing his sales team about his delicatessen owner friend at the 2013 conference meeting, Rowan then asked his representatives, "do you think he runs it through as a cigar or a filet mignon? No. He runs it across as, you figure the rest out."

116. During the April 2013 meeting, Rowan indicated that the representatives would receive more of a benefit from providing the doctor and his or her family with some filet mignons and bottles of wine than by providing a lunch to the office.

117. During the 2013 conference meeting, Rowan stated that he used his friend to order expensive products and then used them to encourage physicians to prescribe SUBSYS, providing the example of how he inconspicuously placed a cooler filled with filet mignons by Dr. Couch's desk and then told the doctor "thank me later."

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

118. After Rowan described his methods for avoiding kickback standards during the 2013 conference meeting, Hill instructed that the representatives should get everything through a caterer, and that she had heard of other representatives getting televisions for their doctors through a caterer.

119. After Hill's comments regarding obtaining items for doctors through caterers during the April conference meeting, Rowan then told the South East Region team, "I don't want to know what you do," but stated that they should do what they need to, but "it's not on me."

120. During the April conference meeting, Rowan instructed his sales representatives to "think outside of the box," and provided the example of going into a restaurant during lunch, asking the staff to ring up a to-go receipt for ten people, but then asking them to not provide the lunch but rather give the representative credit for when they returned with the doctor and his or her spouse later that night for dinner.

121. After providing the example of how to treat doctors to dinner by appearing to be within kickback standard limits during the April 2013 conference, Rowan then told the representatives, "This is the shit we've done all of our careers. But be smart about it, don't be a dipshit. I'm not forcing you to do this, but just telling you this is what we do."

122. After explaining how he encouraged doctors to write SUBSYS prescriptions by offering them filet mignons and dinners during the 2013 conference

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

meeting, Rowan explained "I don't think I did anything wrong because I did it with food;" however, when one sales representative in the meeting began writing notes regarding his methods, Rowan stated, "there is nothing to write down, just thinking outside of the box."

**SUBSYS's Indication and Usage, and INSYS's Off-Label Marketing.**

123. INSYS developed methods for persuading doctors to prescribe SUBSYS for contraindicated and off-label uses, which the FDA states can be deadly.

124. According to its label, the FDA indicated SUBSYS for the limited use of management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain.

125. Patients considered opioid tolerant are those who are taking around-the-clock medicine consisting of at least 25 mcg of transdermal fentanyl/hour.

126. The FDA contraindicated SUBSYS for use in opioid non-tolerant patients because life-threatening respiratory depression and death could occur in patients not on a chronic regiment of opioids. For this reason, SUBSYS is contraindicated in the management of acute or postoperative pain, including headaches or migraines.

127. According to the label, the FDA intended that SUBSYS be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.

128. According to the label, the initial dose of SUBSYS to treat episodes of breakthrough cancer pain is always 100 mcg.

129. According to the SUBSYS label, due to the potential for fatal overdose, physicians should not convert patients on a mcg per mcg basis from any other fentanyl product.

130. According to the SUBSYS label, death has been reported in children who have accidently ingested transmucosal immediate-release fentanyl products and therefore SUBSYS must be kept out of the reach of children.

131. Due to the risk of misuse, abuse, addiction, and overdose, SUBSYS is only available through a restricted program created by the FDA: the TIRF Risk Evaluation and Mitigation Strategy (REMS) program.

132. INSYS has systematically violated and continues to violate every one of these FDA indications and warnings.

133. INSYS has created the "effective dosage message," which continually encourages sales representatives to push doctors to prescribe doses higher than 100 mcg and to quickly titrate patients to high levels because low SUBSYS dosages, as INSYS President Babich states, are known as "the kiss of death."

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

134. INSYS has recently begun to rely on Linden Care Pharmacy, a mail order pharmacy in New York, for its SUBSYS supply.

135. INSYS management promotes sales representatives and doctors to use this pharmacy, as illustrated in a text message that Burlakoff sent to Guzman on or around February 20, 2013, instructing her to, "Just use Linden care, they don't bitch."

136. In March 2013, Guzman became concerned about using this pharmacy because a pharmacist in her territory, Doctor Brad Williams ("Dr. Williams") from Family Care Pharmacy, told her in both a telephone conversation and email letter that it was dangerous for SUBSYS to be distributed to patients through the mail as this illustrated that a pharmacist had not properly educated the patient on storage and disposal of the drug, which could result in children or pets accidently ingesting and overdosing on this powerful drug.

137. During the March 2013 telephone call with Guzman, Dr. Williams told her that some of his patients had come into the pharmacy complaining that they had not even ordered SUBSYS but that it had arrived through the mail at their homes.

138. During the March 2013 conversation with Guzman, Dr. Williams also expressed his concern that medication crossing state lines from New York, where Linden Care is located, to Florida, where his patients lived, violated state laws.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

139. Guzman alerted Burlakoff to Dr. William's concern with the potential risk to patient health and safety by utilizing a mail order pharmacy, but INSYS continues to instruct sales representatives to use Linden Care.

140. During the April 2013 conference in Arizona, Liz Gurrieri ("Gurrieri") from the Internal Reimbursement Center ("IRC") stated that representatives could pre-populate their opt-in forms with Linden Care for the pharmacy section of the form.

**The IRC and Prior Authorization.**

141. INSYS created the IRC in order to help doctors and patients obtain approval for SUBSYS, including for off-label and contraindicated uses.

142. The IRC and physicians enter into agreements, in which the physician provides patient information that the IRC then uses to complete prior authorization forms.

143. INSYS utilizes Specialty Sales Professionals to gather patient information and assist in receiving prior authorization. This includes instructing sale representatives to review private patient information within doctors' offices.

144. The IRC handles appeals when prior authorization requests are denied.

145. The IRC occasionally issues "super vouchers " to patients while their prior authorization and appeals are pending, which allows for free SUBSYS until approval is obtained.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

146. The IRC sometimes uses past and/or later-found instances of patients' cancer diagnoses to obtain the Centers for Medicare and Medicaid Services ("CMS") approval for the treatment of non-cancer pain.

147. On or around April 19, 2013, Gurrieri stated during an INSYS conference presentation to the South East Region team that the IRC needs to know if a patient had cancer in 1992 or if they have cancer – even if that is not what the doctor is treating them for – because that cancer diagnosis is almost an assurance of approval.

148. Gurrieri stated during the April 2013 presentation that patient face sheets are important for the representatives to collect from the doctors because it is through reading those forms that the IRC "finds cancer a lot of the time."

149. During the conference presentation, Gurrieri stated that INSYS is "obviously promoting this on-label," but then went on to instruct the representatives to ask doctors if the patient has a history of cancer and to ensure they include all documentation for SUBSYS approval.

**Instructing Sales Representatives to Market for Off-Label Uses.**

150. INSYS engages in the off-label marketing of SUBSYS by encouraging doctors to write prescriptions for conditions other than breakthrough cancer pain.

151. INSYS is careful to not include the promotion of off-label marketing in official training material or emails, and recently warned employees during the April 2013 conference to keep questionable communications out of text messages.

152. INSYS nevertheless educates its sales representatives on how to implement off-label marketing strategies during conference calls and in-person meetings.

153. During the April 2013 conference in Arizona, Regional Sales Manager Rowan told the South East Region team, "Don't be afraid of what we are indicated for."

154. During this conference meeting on or around April 18, 2013, Rowan asked his sales team to state the SUBSYS indication and the team responded it was for breakthrough cancer pain. Rowan replied it was for breakthrough pain in cancer patient, and he then stated "let's change that" and then stressed "pain" in his second pronouncement of the indication.

155. Specialty Sales Professional Tondre then instructed the other representatives during the conference meeting on or around April 18, 2013 to ask their doctors if there was any difference in their patients having cancer or back pain, and that if the patient ranks high on the pain scale, that "that's the whole point, pain is pain."

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

156. The "pain is pain" mantra Tondre mentioned during the April conference meeting was the same that he had used in an early 2013 conference call where he stated "pain is pain, and SUBSYS treats pain;" this same mantra helped prompt the DOJ to file a False Claims Act suit against Tondre's previous employer, Cephalon, as stated in the DOJ September 29, 2008 press release.

157. Sales Manager Rowan allowed Tondre to share his methods for encouraging doctors to write off-label or contraindicated prescriptions without interruption during the April 2013 conference meeting.

158. Later in the conference meeting on or around April 18, 2013, Rowan instructed the team to call him if there were any issues that should not be put in writing, such as associating speaker programs and fees with how many prescriptions a doctor wrote.

159. During the conference meeting on or around April 18, 2013, Rowan told his team that SUBSYS was great for sickle cell anemia, which is not a type of cancer.

160. In its September 29, 2008 press release regarding the FCA lawsuit against Cephalon, the DOJ stated that promoting fentanyl products for sickle cell anemia constituted off-label marketing.

161. During the conference meeting on or around April 18, 2013, former Cephalon employee Hill instructed other representatives on the methods she utilized

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

on "how to throw something out to a doctor without sounding off-label," such as quoting another doctor.

162. After Hill stated that a representative could quote another doctor in order to offer the off-label promotion of SUBSYS during the April 2013 conference meeting, Rowan interjected and stated that this was not allowed because a representative cannot use a third party to achieve off-label marketing.

163. After Rowan mentioned that using a third party to achieve off-label marketing was not allowed during the April conference meeting, Hill then provided an example of the conversation she would have with the doctor to get around this requirement: "I was speaking to some of the other reps and their doctors are writing for this, that, and the other. Do they have cancer? I don't know, but they were talking about sickle cell anemia."

164. After Hill provided an alternative to "not sound off-label" when encouraging doctors writing SUBSYS for conditions other than breakthrough cancer pain during the April 2013 conference meeting, Rowan allowed Hill to instruct the other representatives without interruption and did not indicate this method was inappropriate; instead, Rowan stated shortly after that a doctor who writes SUBSYS is not worried about its indication.

165. Following the conversation regarding how to encourage doctors to write SUBSYS prescriptions for sickle cell anemia in the conference meeting on or around

April 18, 2013, a member of the South East sales team mentioned that doctors just want to hear the indication first, and then they are ready to listen to other uses, followed by Rowan adding that "If you want to talk science, you're going to suck."

**Targeting Doctors who are Not Oncologists or Pain Specialists.**

166. INSYS has also pursued relationships with doctors who are not oncologists or pain specialists knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain, as approved by the FDA.

167. In its September 29, 2008 press release regarding the FCA suit against Cephalon, the DOJ stated that Cephalon's focus on physicians other than oncologists constituted off-label marketing.

168. On February 21, 2013, IRC Prior Authorization Assistant Tamara Kalmykova ("Kalmykova") emailed Guzman regarding one of Dr. Banchik's patients, stating that the approval request was denied partly because Medicaid identified Dr. Banchik as a neurologist and required proof that Dr. Banchik specialized in pain management.

169. Dr. Banchik is neurologist at the Neurology Centers of Palm Beach, as stated on her patient forms and on her biography on the Neurology Center's website.

170. The Neurology Centers of Palm Beach's website indicates that Dr. Banchik has experience with and provides lectures on pain management, but that her primary background is in neurology, which includes the specialty area of headaches.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

171. The Neurology Center of Palm Beach's website does not list cancer treatment as a specialty area, although it does list headaches/migraines and various forms of injuries as areas of focus for the Neurology Center's physicians.

172. INSYS is targeting doctors who are not oncologists or pain management physicians specializing in cancer treatment and who likely see far more neurological patients than cancer patients.

173. The FDA contraindicated SUBSYS for acute pain stemming from migraines or headaches, due to the serious consequences that could result from prescribing SUBSYS to patient not on a chronic regiment of opioids for cancer treatment.

174. Dr. Banchik mentioned to Guzman in August 2012 that doctors who were unable to prescribe SUBSYS could refer their patients to her to write the prescription, which indicates that Dr. Banchik was likely unfamiliar with these referred patients' particular histories, which thus increases the chances of SUBSYS causing serious side effects in these new patients who doctors unfamiliar with SUBSYS referred specifically for such a prescription.

175. INSYS's pursuit of relationships with non-FDA approved doctors is not an uncommon practice for the company.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

176. On or around August 16, 2012, National Trainer Hill admitted in a text message to Guzman that none of the attendees at a speaker program she had recently conducted were oncologists or pain specialists.

177. Hill serves as the INSYS National Trainer and was a former Cephalon employee, who should be aware of FDA standards.

178. On or around April 19, 2013 during the Arizona conference, a South East Region sales representative stated that she had a neurologist that was prescribing 1600 mcg for a patient.

**INSYS's Off-Label Marketing Results in Doctors Prescribing SUBSYS for Contraindications, Off-Label Use, and Over-Titrating.**

179. INSYS's off-label marketing schemes have resulted in doctors writing prescriptions for contraindicated uses, such as postoperative pain, and for off-label uses, such as back pain.

180. INSYS has also crafted the "kiss of death" and "effective dosage" messages, which encourage doctors to start patients at a higher dose than 100 mcg and/or titrate patients quickly, which is counter to the FDA dosage instructions and can be very dangerous with such a potent opioid agonist.

**Prescriptions for Contraindications.**

181. SUBSYS is contraindicated for postoperative pain and for headaches/migraines because life-threatening respiratory depression and death could occur in patients.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

182. INSYS ignores the FDA contraindications warnings and encourages doctors to recommend SUBSYS for such uses, which has resulted in prescriptions for contraindicated conditions.

183. On or around February 21, 2013, Kalmykova emailed Guzman regarding one of Dr. Banchik's Medicaid patients, stating that his approval request had been denied because the office notes focused on the patient's knee surgery rather than the cancer diagnosis, under which the request was filed.

184. Dr. Banchik's Medicaid patient whom Kalmykova emailed Guzman about on or around February 21, 2013 had previously had cancer but the SUBSYS prescription was to treat the patient's post-operation pain following knee surgery.

185. Kalmykova also indicated in her email to Guzman on or around February 21, 2012 that the IRC needed office notes that supported the correct diagnosis (cancer), thus impliedly asking Guzman and Dr. Banchik to alter office notes that had stated the actual purpose for the Medicaid patient's prescription (post-operative pain) so the request would fit CMS's approval requirements.

186. On or around March 18, 2013, Kalmykova followed up with Guzman regarding Dr. Banchik's Medaid patient, asking Guzman if INSYS now had all the required documentation from Dr. Banchik, especially because "the patient has actually tried the medication due to the one time approval that we got from his work comp back in February."

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

187. The February 2012 prior authorization for SUBSYS Dr. Banchik's Medicaid patient received through worker's compensation was not for treatment of the patient's cancer pain, but rather for his knee injury.

188. The Relator believes that the initial prescription for Dr. Banchik's Medicaid patient in February 2012 was 200 mcg, 30 units.

189. According to an email from Burlakoff on May 13, 2012, 30 units of SUBSYS at a 200 mcg dose costs about $900 dollars and 120 units at a 400 mcg dose costs approximately $5,100.

**Prescriptions for Off-Label Uses.**

190. The treatment of back pain is one of the primary off-label uses for which doctors prescribe SUBSYS.

191. On or around April 18, 2013 during the Arizona INSYS conference, management and sales representatives discussed a method for encouraging doctors to prescribe SUBSYS for the off-label use of treating back pain: instruct the physician to ask the patient if there was anything they could not do during the day because of their back.

192. During this conference meeting on or around April 18, 2013, Hill and Tondre stated representatives could rephrase this by asking if the patient was restricted from doing anything because of pain or asking about the patient's "functionality."

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

193. After Tondre provided an alternative method for promoting SUBSYS for the off-label use of back pain, Rowan stated that INSYS was lucky to have Tondre's knowledge and then instructed the representatives to paint a picture and allow the doctor "to go there themselves."

194. INSYS's instructions to representatives on how they can sell SUBSYS for non-FDA approved uses without "sounding off-label" and marketing SUBSYS by utilizing the mantra "pain is pain" has resulted in a substantial number of off-label prescriptions, many for Medicare and Medicaid patients.

195. In order to enroll in the REMS program and be authorized by the FDA to prescribe SUBSYS, physicians must sign a TIRF form stating that he or she understands the SUBSYS indication.

196. On or around March 6, 2013, Dr. Gatz prescribed SUBSYS for a Medicare patient using diagnosis codes 724.2 (lumbago), 722.52, and 721.3 for "lumbosacral spondylosis" and "lumbar radiculopathy," which are, respectively, a degenerative condition affecting the lower spine and lower-back nerve root pain.

197. On or around March 11, 2013, Dr. Gatz prescribed 600 mcg of SUBSYS for a Medicare patient with chronic pain; a staff member in Dr. Gatz's office confirmed in a March 18, 2013 text message to Guzman that the patient had chronic pain and not cancer.

198. On or around April 11, 2013, Doctor Daniel Ettedgui ("Dr. Ettedgui") prescribed 800 mcg of SUBSYS for a Medicare patient with the diagnosis codes of "Amputation of Leg Above Knee 897.2; Lumbosacral Plexus Lesions 353.1; Sciatica Neuralgia 724.3; Lumber Radiculopathy 724.4."

199. On or around April 12, 2013 INSYS Director of Managed Markets Mike Grury ("Grury") sent Burlakoff and Guzman text messages stating that Jessica Chavez from the IRC contacted Medicare in order to get the patient approved for a voucher, which INSYS can use to sway the patient's purchasing decision and potentially dissuade them from less expensive alternatives and generic medications.

200. On December 18, 2012, in text messages between Jay Patel ("Patel") from Apex Pharmacy and Guzman, Patel confirmed that the diagnosis provided by Dr. Gatz for a SUBSYS prescription was for patient Joseph Leo's back pain.

201. On February 11, 2013, a staff member from Dr. Gatz's office sent Guzman a text message stating that they had just found out that patient Joseph Leo had cancer, verifying that Dr. Gatz had previously prescribed SUBSYS for the off-label use of treating his back pain.

**Falsification of Documents to CMS.**

202. The IRC used Dr. Gatz's new cancer diagnosis for Joseph Leo to continue obtaining approval for the patient's SUBSYS prescription to treat his back pain, particularly because the IRC stated at the April 2013 conference that the

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

department reviews patients' medical information to find cancer to obtain prior authorization.

203. The Relator possess knowledge of at least one instance in which the IRC utilized a previous cancer diagnosis or a cancer diagnosis found after the patient already received SUBSYS to treat a non-cancer condition in order to gain prior authorization from CMS for the non-cancer use through falsification of documents.

204. In or around late April or early May 2013, the IRC filled out a prior authorization form and identified the diagnosis as cancer; however, upon receiving the form, Dr. Gatz's office whited out the cancer diagnosis and wrote "chronic pain," as this was the reason Dr. Gatz had prescribed SUBSYS.

205. In or around late April or early May 2013, after Dr. Gatz modified the prior authorization to reflect "chronic pain" as the diagnosis, the IRC indicated to CMS that the form was incorrect and sent a "corrected" form, with the cancer diagnosis, to CMS.

206. While Dr. Gatz did not participate in the falsification of the prior authorization form sent to CMS in or around April or May 2013, he and the IRC have worked together in other cases to submit false information to CMS.

207. On or around December 18, 2012, Dr. Gatz filled out an IRC prior authorization form for a patient and identified the diagnosis as "neoplastic pain,"

which matches code 338.3 (Breakthrough Cancer Pain) that the IRC included in the Medicare form for the same patient on or around December 21, 2012.

208. Dr. Gatz's January 23, 2013 Patient Face Sheet (which provides background information on the client) for the patient with the December 2012 neoplastic pain diagnosis, uses diagnosis codes 719.48 (pain in joint) and 337.00 (nerve damage).

209. The difference in the diagnosis codes used on the forms submitted to CMS by the IRC and Dr. Gatz with the Patient Face Sheet indicates that Dr. Gatz was prescribing SUBSYS for nerve and joint pain, but he and the IRC were using the cancer diagnosis to obtain CMS approval.

**Switching Patients from Actiq Indicates the Large Number of Medicare and Medicaid Patients being Prescribed SUBSYS.**

210. One of INSYS's primary marketing plans is to encourage doctors to switch patients from Actiq and Fentora to SUBSYS.

211. During a conference call on or around December 12, 2012, Guzman sent a text message to Hill stating that most patients using Actiq are on Medicare or Medicaid, in response to management instructing the sales representatives on the call to switch Actiq patients to SUBSYS while also stating that compliance issues existed when offering Medicare and Medicaid patients SUBSYS.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

212. INSYS has been successful in inducing doctors to switch patients from Actiq to SUBSYS, including Dr. Liporace, Dr. Krost, Dr. Banchik, and Dr. Gatz in Guzman's territory alone.

213. On or around February 11, 2013, Dr. Gatz prescribed 100 mcg of SUBSYS for a Medicare patient.

214. On or around March 19, 2013, Dr. Banchik prescribed SUBSYS for a Medicaid cancer patient.

215. Guzman is informed and based thereon alleges that Medicare and Medicaid patients account for a substantial amount of SUBSYS purchasers in her territory and all over the country.

216. INSYS management, such as Burlakoff, are careful to officially state that vouchers and other incentives cannot be given to Medicare or Medicaid patients for compliance reasons but management encourages and/or is aware that vouchers and incentives are provided to persuade Medicare and Medicaid to purchase SUBSYS.

217. On December 12, 2012, a concerned Guzman sent Burlakoff a text message stating that Dr. Banchik had "put a bunch [of] Medicare patients" on free SUBSYS product, to which Burlakoff responded that he spoke with Babich and that it was fine.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**Titration and Over-Prescribing.**

218. INSYS disregards the FDA's titration warning and encourages doctors to prescribe strong doses of SUBSYS.

219. The FDA states on the SUBSYS label that the initial dose to treat episodes of breakthrough cancer pain is always 100 mcg.

220. The SUBSYS label instructs doctors to prescribe the initial titration supply of 100 mcg SUBSYS units, which limits the number of units in the home during titration, and to avoid prescribing a higher does until patients have used up all units to prevent confusion and possible overdose.

221. The FDA states that patients should take a maximum of two doses of SUBSYS for any breakthrough pain episode.

222. In or around August 2012, INSYS created a new marketing tactic referred to as the "effective dosage" or "the kiss of death" message.

223. The effective dosage message and the kiss of death consists of telling doctors that 100 mcg is not effective for pain relief and continually pushing them to titrate to higher dosages, with the "magic number" referred to in the April 2013 Arizona conference as 800 mcg.

224. As part of the effective dosage message or kiss of death campaign, INSYS sends a "Daily Rep Report for Low Strength Use" via email every day for dosages at or below 400 mcg to sales representatives.

225. While INSYS refrains from referencing the kiss of death or the effective dosage message in official emails and statements, INSYS management encourages this marketing scheme in person, over the telephone, and through some text messages.

226. On or around August 24, 2012, Burlakoff sent a text message to Guzman and other representatives stating, "We will do the Matt Napolitano/Marketing/effective dose message."

227. Napoletano is a former Cephalon marketing executive.

228. On or around September 6, 2012, Burlakoff sent a text message to Guzman and other sales professionals stating that INSYS would "get together as a whole company, and review 'effective dose message;'" indicating that this message is used throughout INSYS.

229. INSYS's off-label marketing titration campaign has resulted in doctors starting patients on SUBSYS dosages that are higher than the FDA-approved 100 mcg.

230. On or around May 13, 2013, Burlakoff sent an email containing a chart of twelve new patients for the week of May 11, all of which were trying SUBSYS for the first time. Only one individual had 100 mcg listed under the "strength" column, with the other eleven patients receiving strengths between 200 mcg and 1600 mcg, with the average dosage level at approximately 600 mcg.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

231. On or around March 1, 2013, Guzman received a voicemail from Patel of Apex Pharmacy stating that the 1200 mcg dosage of SUBSYS for a patient was too high, and that if the prior authorization had not been completed, that INSYS should hold off and return the patient to 800 mcg.

232. In or around March 2013, Burlakoff sent an email congratulating one individual who had encouraged a doctor to switch a patient from 1600 mcg of Actiq to a SUBSYS prescription that would be titrated to 1200 mcg, and then stated "Cha Ching again!" for the $40,320 that INSYS would make from the sale to this patient.

233. On or around April 12, 2013, Hill told Guzman during a conversation that the 10-pack of SUBSYS was only to discourage a patient from staying on 100 mcg and was to force them to go up in strength.

234. During the conversation on or around April 12, 2013, Hill told Guzman that Linden Care, upon which INSYS is increasingly relying =to supply SUBSYS, will only dispense a 10-pack of 100 mcg or 200 mcg and up.

235. On or around April 18, 2013, Rowan instructed representatives during the INSYS conference to "increase the strength as much as possible – that will give you the most bang for your buck."

236. On or around April 18, 2013, one sales representative stated during a conference meeting that a doctor had prescribed a 1200 mcg and a 600 mcg dose to a

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

patient, with one being covered by insurance and the other being covered out-of-pocket.

237. On the SUBSYS label, the FDA states that, "To reduce the risk of overdose during titration, patients should have only one strength of SUBSYS available at any time."

238. After the representative mentioned the dual doses for one patient during the April 2013 conference meeting, Rowan and Gurrieri offered a way around the FDA and CMS standards by stating that one prescription could be filled one day and the second could be filled the next.

239. On or around April 18, the sales representative stated during the conference meeting that the doctor had switched the patient with two prescriptions doses from another fentanyl product, but prescribed the same amount of mcg for SUBSYS.

240. The SUBSYS label states that, "When prescribing, do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS;" the FDA warns against this under the "Medication Errors" portion of the label, stating in bold that this can result in a fatal overdose.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**Count I: False Claims Act Violations**
**31 U.S.C. § 3729(a)(1) Against Defendant**

241. Guzman realleges and incorporates the allegations set forth above as though fully alleged therein.

242. INSYS knowingly caused to be presented to the United States Government false or fraudulent claims for payment or approval under the federally-funded Medicaid and Medicare programs in violation of 31 U.S.C. § 3729(a)(1) when INSYS violated 42 U.S.C. § 1320a-7b with its structured kickback system to induce doctors to recommend SUBSYS because 42 U.S.C. § 1320a-7b(g) provides that a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of the federal False Claims Act.

243. INSYS knowingly offered kickbacks to doctors when its managers instructed representatives to offer incentives to doctors in exchange for SUBSYS prescriptions, even though INSYS management knew this violated FCA laws, including during the April 2013 conference when Rowan told representatives not to "put in black and white" that speaker programs and fees are based on the amount of SUBSYS a doctor prescribes.

244. INSYS management and sales representatives shared methods in which to maneuver around anti-kickback standards and compliance laws, such as ordering meals during lunch as to-go orders but instructing the restaurant to credit the

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

representative when they later brought in just the doctor and his or her spouse, or by ordering televisions through caterers for speaker programs.

245. INSYS management was aware of FCA laws and compliance standards but justified its instructions to sales representatives to violate such laws a standards, such as when Regional Sales Manager Rowan stated during the April 2013 conference that he did not believe he was doing anything wrong because he was inducing doctors with food, and then stated that he was not asking the sales representatives to do anything wrong, just to be aware of how they can be a top sales person.

246. INSYS knowingly caused to be presented to the Government false or fraudulent claims for payment or approval under the federally-funded Medicaid program when in or around February 21, 2013, it submitted to CMS forms indicating that a previous cancer diagnosis was the reason for Dr. Banchik prescribing SUBSYS for a Medicaid patient when the prescription was being used to treat postoperative knee pain, a contraindicated use; this practice is widespread throughout INSYS, particularly because the IRC obtains approval from Medicaid and Medicare for the entire company.

247. INSYS knowingly caused to be presented to the Government false or fraudulent claims for payment or approval when in late April or early May 2013, the IRC filled out a prior authorization form and identified the diagnosis as cancer on the

form but Dr. Gatz later whited out the cancer diagnosis and wrote "chronic pain" (the reason for the SUBSYS prescription); the IRC told CMS that the form was incorrect with the chronic pain diagnosis and sent a "corrected" form. This practice is widespread throughout INSYS, particularly because the IRC obtains approval from Medicaid and Medicare for the entire company.

248. INSYS knowingly caused to be presented to the Government false or fraudulent claims for payment or approval when in or around December 18, 2012, the IRC, working with Dr. Gatz, submitted to CMS prior authorization and Medicare forms indicating that the patient's diagnosis was neoplastic pain when Dr. Gatz's Patient Face Sheet noted that the patient had joint and nerve pain, a Sheet to which the IRC had access; this practice is widespread throughout INSYS, particularly because the IRC obtains approval from Medicaid and Medicare for the entire company.

249. INSYS knowinglu caused to be presented to the Government false or fraudulent claims for payment or approval when it engaged in off-label marketing, such as failing to meet the off-label dissemination requirements of 21 U.S.C. §360aaa, distributing misbranded drugs in violation of 21 U.S.C. §331(a), and encouraged doctors to prescribe SUBSYS for uses it knew were not approved by the FDA and assisted through the IRC in obtaining and approval and payment from

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

Medicaid and Medicare for SUBSYS prescriptions for non-approved uses in violation of 42 U.S.C §1396r-8(k)(3) and 42 U.S.C. §§ 1395w-102 – §1395w-104.

250. The United States, unaware of the falsity of the claims and/or statements made by INSYS and in reliance on the accuracy thereof, paid Defendant for such false or fraudulent claims.

251. By reasons of the acts and conduct of INSYS in violation of 31 U.S.C. § 3729(a)(1), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

**Count II: Off-Label Dissemination Violations**
**21 U.S.C. §360aaa Against Defendant**

252. A manufacturer may disseminate information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling only if: (1) there is an application filed pursuant to 21 U.S.C. § 355; (2) the information meets the requirements of 21 U.S.C. § 360aaa-1; (3) the information is not derived from clinical research conducted by another manufacturer or permission has been given to use such information; (4) the manufacturer has, within 60 days before dissemination submitted to the Secretary (A) a copy of the information to be disseminated and (B) any clinical trial information relating to the safety or effectiveness of the new use; (5) the manufacturer has complied with section 360aaa-3; (6) along with the information

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

on the new use to be disseminated, the manufacturer includes a statement disclosing (A)(i) that the use in not approved, (ii) that the information is being disseminated at the manufacturer's expense, (iii) the names of the authors who have received compensation from the manufacturer, (iv) the official labeling for the drug, (v) a statement that there are products or treatments that have been approved for the use, (vi) identification of any person that provided funding for the research, and (B) a bibliography of other articles that have been published about the use of the drug.

253. INSYS did not satisfy these requirements before encouraging doctors to prescribe SUBSYS for contraindicated and off-label uses, such as for postoperative pain and back pain, and before it pursued doctor who were neither oncologist nor pain management specialists knowledgeable in opioids to prescribe SUBSYS for patients, including those insured by Medicare and Medicaid, and therefore violated 21 U.S.C. § 360aaa.

254. Because INSYS did not meet the 21 U.S.C. § 360aaa dissemination requirements and thus engaged in off-label marketing of SUBSYS, it violated 31 U.S.C. § 3729(a)(1) by knowingly presenting or causing to be presented to the United States Government false or fraudulent claims for payment or approval under the federally-funded Medicaid and Medicare programs.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**Count III: Medicaid Non-Approved Use Violations**
**42 U.S.C. § 1396r-8(k)(3) Against Defendant**

255. Reimbursement by Medicaid is, with only one rare exception (an anticancer chemotherapeutic regimen), prohibited if the drug is not being used for a medically accepted indication. 42 U.S.C. §1396r-8(k)(3).

256. 42 U.S.C. §1396r-8 (k)(6) defines a medically accepted indication as one which is approved under the Food, Drug, and Cosmetic Act.

257. The FDA approved SUBSYS for the limited use of treatment for breakthrough pain in cancer patients.

258. INSYS management instructed sales representatives on and allowed former Cephalon employees to share methods for promoting SUBSYS to doctors for off-label and contraindicated uses without sounding "off-label," including at the April 2013 INSYS conference in Arizona and during an early 2013 conference call in which former Cephalon employee Dan Tondre explained his sales motto "pain is pain."

259. During the April 2013 INSYS conference in Arizona, INSYS instructed sales representatives on methods for promoting SUBSYS for treating sickle cell anemia and back pain, neither of which were conditions approved or indicated by the FDA for SUBSYS use.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

260. During the April 2013 INSYS conference in Arizona, Manager Joe Rowan told sales representatives, "I don't want to know what you do," but stated that they should do what they need to, but "it's not on me."

261. INSYS is aware that doctors are prescribing SUBSYS for off-label and contraindicated uses for Medicaid patients, which is prohibited by 42 U.S.C. §1396r-8(k)(3), encourages doctors to write and continue writing these prescriptions, and assists them in gaining authorizations for the off-label and contraindicated prescriptions through the IRC.

262. In February 2013, the IRC worked to obtain CMS approval for a Medicaid patient of Dr. Banchik's to treat the pain he experienced following knee surgery by using the patient's past history of cancer.

263. The FDA contraindicates SUBSYS for the use in treating postoperative pain.

264. The FDA states that SUBSYS is to be prescribed by oncologist or pain specialists familiar with opioids.

265. INSYS pursued relationships with non-oncologists, such as neurologists, for the purpose of encouraging those doctors to prescribe SUBSYS.

266. Medicaid patients account for a significant portion of SUBSYS users.

267. INSYS violated 42 U.S.C. § 1396r-8(k)(3) when it encouraged doctors to prescribe SUBSYS for uses it knew were not approved by the FDA and assisted

through the IRC in obtaining approval and payment from Medicaid for SUBSYS prescriptions for non-approved uses.

268. Because INSYS violated 42 U.S.C. § 1396r-8(k)(3) by encouraging doctors to prescribed SUSYS for non-approved uses and assisted doctors in obtaining approval and payment for non-approved uses, it also violated 31 U.S.C. § 3729(a)(1) by knowingly presenting or causing to be presented to the United States Government false or fraudulent claims for payment or approval under the federally-funded Medicaid program.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## Count V: Medicare Non-Approved Use Violations
## 42 U.S.C. §§ 1395w-102 – §1395w-104 Against Defendant

269. Medicare Part D, 42 U.S.C. §§1395w-102 – §1395w-104, states that a plan sponsor is required to provide coverage of qualified prescription drugs.

270. The definition for a covered Medicare drug is outlined in 1395w-102(e), which includes the term "medically accepted indication."

271. 42 U.S.C. §1396r-8 (k)(6) defines a medically accepted indication as one which is approved under the Food, Drug, and Cosmetic Act.

272. The FDA approved SUBSYS for the limited use of treatment for breakthrough pain in cancer patients.

273. INSYS management instructed sales representatives on and allowed former Cephalon employees to share methods for promoting SUBSYS to doctors for off-label and contraindicated uses without sounding "off-label," including at the April

2013 INSYS conference in Arizona and during an early 2013 conference call in which former Cephalon employee Dan Tondre explained his sales motto "pain is pain."

274. During the April 2013 INSYS conference in Arizona, INSYS instructed sales representatives on methods for promoting SUBSYS for treating sickle cell anemia and back pain, neither of which were conditions approved or indicated by the FDA for SUBSYS use.

275. During the April 2013 INSYS conference in Arizona, Manager Joe Rowan told sales representatives, "I don't want to know what you do," but stated that they should do what they need to, but "it's not on me."

276. INSYS's off-label marketing has resulted in doctors prescribing SUBSYS for off-label uses, such as Dr. Gatz writing SUBSYS prescriptions for Medicare patients to treat their back and chronic pain and Dr. Ettedgui prescribing SUBSYS for a Medicare patient to treat his post-amputation and lower-back pain.

277. INSYS is aware that doctors are prescribing SUBSYS for off-label and contraindicated for Medicare patients, which is prohibited by 42 U.S.C. §§1395w-102 – §1395w-104, encourages them to write and continue writing these prescriptions, and assists them in gaining authorizations for these off-label and contraindicated prescriptions through the IRC.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

278. In or around December 18, 2012, the IRC and Dr. Gatz submitted forms to Medicare indicating that the patient's diagnosis was neoplastic pain in order to gain approval for the SUBSYS prescriptions; however, Dr. Gatz's Patient Face Sheet indicated that the patient had joint and nerve pain, which are off-label uses.

279. The FDA states that SUBSYS is to be prescribed by oncologist or pain specialists familiar with opioids.

280. INSYS pursued relationships with non-oncologists, such as neurologists, for the purpose of encouraging those doctors to prescribe SUBSYS.

281. Medicare patients account for a significant portion of SUBSYS users.

282. INSYS violated 42 U.S.C. § 1395w-102 when it encouraged doctors to prescribe SUBSYS for uses it knew were not approved by the FDA and assisted through the IRC in obtaining approval and payment from Medicare for SUBSYS prescriptions for non-approved uses.

283. Because INSYS violated 42 U.S.C. § 1395w-102 by encouraging doctors to prescribed SUSYS for non-approved uses and assisted doctors in obtaining approval and payment for non-approved uses, it also violated 31 U.S.C. § 3729(a)(1) by knowingly presenting or causing to be presented to the United States Government false or fraudulent claims for payment or approval under the federally-funded Medicare program.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## PRAYER FOR RELIEF

WHEREFORE, the Relator Maria Guzman, acting on behalf of and in the name of the United States of America, and on her own behalf, prays that judgment be entered against Defendant for violation of the False Claims Act as follows:

1. In favor of the United States against the Defendants for treble damages to the Federal Government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Act;

2. In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3739(d) to include reasonable expenses, attorney fees, and costs incurred by the Relator;

3. For all costs of the False Claims Act civil action; and

4. In favor of the Relator and the United States for further relief as this court deems just and equitable.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

Respectfully submitted,

THE EMPLOYMENT LAW GROUP
LAW OFFICE OF MARK KLEIMAN

By: [signature]

David L. Scher, Esq.
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2802
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

By: [signature]

Mark Kleiman, Esq.
Law Office of Mark Allen Kleiman
mkleiman@quitam.org
2907 Stanford Avenue
Venice, California 90292
310-306-8094

Attorneys for *Qui Tam* Plaintiff

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relator demands a jury trial as to all issues so triable.

Dated: August 12, 2013

Respectfully submitted,

THE EMPLOYMENT LAW GROUP
LAW OFFICE OF MARK KLEIMAN

By: David L. Scher /mak

David L. Scher, Esq.
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2802
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

By: ______________________

Mark Kleiman, Esq.
Law Office of Mark Allen Kleiman
mkleiman@quitam.org
2907 Stanford Avenue
Venice, California 90292
310-306-8094

Attorneys for *Qui Tam* Plaintiff

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**

was served via USPS Certified Mail / Return Receipt Requested, on this 12th day of August 2013, upon:

Eric Holder, Esq.
Attorney General of the United States
Office of the Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Andre Birotte, Esq.
United States Attorney General
United States Attorney's Office
Central District of California
312 North Spring Street
Suite 1200
Los Angeles, California 90012

Abraham Meltzer, Esq.
Assistant United States Attorney
Civil Fraud Section
Federal Building, Suite 7516
300 N. Los Angeles St.
Los Angeles, California 90012
Phone: 213-894-7155

Wendy Weiss, Esq.
Chief, Civil Fraud Division
United States Attorney's Office
Central District of California
300 N. Los Angeles St., Room 7516
Los Angeles, CA 90012
Phone: 213-894-0444

Assistant United States Attorney
United States Attorney's Office
Central District of California
300 N. Los Angeles St.
Los Angeles, California 90012
Phone: 213-894-3995

Mark Kleiman

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

David L. Scher, Esq.
dscher@employmentlawgroup.com
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
soswald@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)

Mark Kleiman, Esq.
Law Office of Mark Allen Kleiman
mkleiman@quitam.org
2907 Stanford Avenue
Venice, California 90292
310-306-8094

**The Employment Law Group, P.C.**
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

[UNDER SEAL],

Plaintiff,

v.
[UNDER SEAL],

Defendant.

CASE NO.:______________

**CIVIL COVER SHEET**

**FILED UNDER SEAL**
(Pursuant to 31 U.S.C. § 3729 False Claims Act)

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )
UNITED STATES OF AMERICA ex rel. MARIA GUZMAN

**DEFENDANTS** ( Check box if you are representing yourself ☐ )
INSYS THERAPEUTICS, INCOPORATED

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
David L. Scher, Esq., The Employment Law Group, P.C., 888 17th Street, NW, Suite 900 Washington, D.C. 20006-3307, 202-261-2806
Mark Kleiman, Law Office of Mark Kleiman, 2907 Stanford Avenue, Venice, CA 90292, 310-306-8094

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
N/A

**II. BASIS OF JURISDICTION** (Place an X in one box only.)
- ☒ 1. U.S. Government Plaintiff
- ☐ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)
☒ 1. Original Proceeding ☐ 2. Removed from State Court ☐ 3. Remanded from Appellate Court ☐ 4. Reinstated or Reopened ☐ 5. Transferred from Another District (Specify) ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT: $** ______

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
False Claims Act, 31 U.S.C. § 3729, et seq.

**VII. NATURE OF SUIT** (Place an X in one box only).

**OTHER STATUTES**
- ☒ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/Etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Org.
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Info. Act
- ☐ 896 Arbitration
- ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.)
- ☐ 153 Recovery of Overpayment of Vet. Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment

**REAL PROPERTY CONT.**
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpratice
- ☐ 365 Personal Injury-Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**TORTS**
**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accomodations
- ☐ 445 American with Disabilities-Employment
- ☐ 446 American with Disabilities-Other
- ☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus/Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Ret. Inc. Security Act

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405 (g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405 (g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

FOR OFFICE USE ONLY: Case Number: CV13- 5861

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] NO [ ] YES

If yes, list case number(s): ______

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] NO [ ] YES

If yes, list case number(s): ______

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)

[ ] A. Arise from the same or closely related transactions, happenings, or events; or

[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[X] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, California | Florida; Arizona; California |

***Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** [signature] DATE: 8/12/13

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **CIVIL COVER SHEET** was served via USPS Certified Mail / Return Receipt Requested, on this 12th day of August 2013, upon:

Eric Holder, Esq.
Attorney General of the United States
Office of the Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Andre Birotte, Esq.
United States Attorney General
United States Attorney's Office
Central District of California
312 North Spring Street
Suite 1200
Los Angeles, California 90012

Abraham Meltzer, Esq.
Assistant United States Attorney
Civil Fraud Section
Federal Building, Suite 7516
300 N. Los Angeles St.
Los Angeles, California 90012
Phone: 213-894-7155

Wendy Weiss, Esq.
Chief, Civil Fraud Division
United States Attorney's Office
Central District of California
300 N. Los Angeles St., Room 7516
Los Angeles, CA 90012
Phone: 213-894-0444

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

John Lee
Assistant United States Attorney
United States Attorney's Office
Central District of California
300 N. Los Angeles St.
Los Angeles, California 90012
Phone: 213-894-3995

Mark Kleiman